015-2069, Arendi v. Apple, 39-174, 39 is what I got. Mr. Sunstein, please proceed when you're ready. Honorable Judges, good morning. The Board's construction of application program as being independently executable, but also including dependent subsidiary programs, is wrong, not only because it is self-contradictory, but also because it ignores the problem solved by the invention and it misunderstands the prior art. The problem solved by the 854 patent is automating the interaction between a word processor on the one hand, and a separate contact manager on the other. The reason why it is challenging to get information out of the contact manager, and to use it in the document in the word processor, is that both the contact manager and the word processor are separate application programs. That is, they're independently executable. Each program can be activated and run alone, without the other. When you say independently executable, but that's not what the district court held, that's what the patent office held, it held independent and executable, not independently executable, correct? Well, the Board does not distinguish between independently executable program and independent executable program. If you look at the record in A-10, footnote 2, and in the other decision, A-78, footnote 1, this point is discussed in note 7 of the appeal brief, page 39. Now, maybe they just made a mistake and left off the L-Y, that was my thinking. But if they meant something different, we have to take into account that the word independent is an adjective. I know this from school a few years ago, and if it's an adjective, it cannot be modifying another adjective, namely executable. It therefore must modify program. So if an application program is an independent program, and it's also an executable program, we have the fact that executable doesn't add anything, right? All programs that work are executable. And what is an independent program? I'm not sure, but I'm pretty sure that that definition, if it was intended as what it was written, and it's supposedly different, outstanding what the Board said, from independently executable, reads the word application out of the claim. The claim says application program. It doesn't say simply program. It says application program. And we think application program means something that's independently executable. And if you look at the language, if you look at the examples that are in the specification, every program that's discussed there is manifestly a program that's independently executable. But what in the specification would limit the application program to an independently executable program as opposed to a subsidiary program? In other words, why does application have any distinction in the claim as opposed to simply saying program? And the reason is it's not any old program. The problem solved by this technology is to allow the interaction between two programs that normally have to be invoked separately. If I want to take something from my contact management application and insert it into the word processor application, I have to do some work. And this is what struck the inventor at the time of the invention of this technology. The work would be I have to open the contact management program. I have to extract the information of interest with respect to the contact. I then have to separately open the word processing program and use that information in the document open in the word processing program. That's a lot of work. So what this technology does, and it's very clever in doing so in my judgment, while working within the word processing program, I can access information in the independently executable contact management. I understand that that's a lot of what you do describe in the spec, but what in the claims actually requires this independently executable program? The word application program. There's a first one and a second one that's required in claim one. So are you saying that these sub-programs are not application programs? In the prior art, when you go to Hakamovich and Domini, you have precisely programs that work only at the behest of the word processor. They are subsidiary dependent programs. They must and can only be activated by the independently executable program, namely the word processor. And the testimony of Dr. Levy that's in the record, blithely ignored by the PTAB, makes that abundantly clear. But we also have the words that are directly- But aren't those programs in the prior art referred to as application programs? No. In fact, this is one of the other things that the PTAB did. The PTAB used the prior art to try to interpret what the word application program means in the claim. Instead of looking at the examples in the specification, the PTAB- But there are examples in the specification, but it doesn't say that those are the only possible embodiments that could be in the claims. I mean, aren't you reading those limitations into the claims just because you refer to word or outlook? And the spec doesn't mean those are the only things that could constitute application. Well, and in fact, what's interesting, if you look in the background art section of the patent, the background art section sets up the problem, and it uses the word word processor, and it uses the word something like contact management program as generic stand-ins for a whole bunch of programs that manifestly, when you look at them, are all independently executable. So I think the way the problem is set up in the specification tells the story. But interestingly, the references that are relied upon by the board as well use the word in a way that's consistent with what the claim requires. Domini says this. The board seized on one passage in Domini, and they said that proves that Domini is an application program. That's what the board did. May I trouble you for some water, a fresh glass? So- Well, doesn't Domini actually define application program to include the spell checker and grammar checker? I disagree that it does. I think it does not. The one passage that the board cited does not expressly tag the spell checker by itself as an application program. In fact, the only program type that Domini specifically tags as an application program is the word processor. Take a look at Domini column five, lines one to four, A250. The preferred embodiment of the present invention is represented by word, version 8.0, which is a word processing application program produced by Microsoft Corporation. There are repeated references throughout the text to preferred application program module. Preferably, the spell, and this is column 16, lines 58 to 59 at A255, preferably the spell checker program module is called by the preferred application program module. I certainly see all of the references you're pointing us to, but what about column seven, line 47, where the sentence reads, the application programs 37 may include a number of different programs, such as a word processing program, comma, a spell checker program, comma, a grammar checker program. And so I see all the points that you're making, and I think that the way you're interpreting this prior art reference is, quite frankly, reasonable. But the problem is the board points to this sentence, which makes their interpretation also reasonable, and I have to give them deference because this is a fact question. So how could I possibly say their decision is not supported by substantial evidence in light of this sentence? The fact that the construction of domini everywhere else shows that the board's reading of that is wrong. Number one, we have to remember that their reading of this document is without the benefit of the examples in the specification, right? But do you agree that this sentence in the abstract, suppose this were the only sentence in domini, this sentence in the abstract which the board relied on, suppose this is the only sentence that says the application programs may include a spell checking program, checker program. So wouldn't that define for domini, if this were the only sentence in this patent, a spell checker program as an application program? I think you can argue to the contrary rather effectively because when you read in that passage spell checker program, it didn't say spell checker application program, did it? It said spell checker program. Nowhere does domini expressly tag, even in that passage, the spell checker by itself as an application program. It says the application program. Yeah, it's a predicate nominative. I'll agree with you it's in the predicate nominative. But in the predicate nominative after the word are or is. I got a 15-year-old that could use your help with grammar. Yeah, I don't even know that I know what a predicate nominative is. It means. But they didn't teach that at MIT. Well, I did graduate work in English after MIT myself. So the verb is. I'm just kidding about offering you a job, by the way. Well, so much of what we do is about language. And what the board did in this case is that it used the language in the references of prior art to try to interpret the claim language that was used by the patent. Well, and maybe let's talk about language because that's exactly what patent analysis is all about. And there is nothing in the claims of the patent that exclude these kinds of subsidiary programs from being application programs. And the board, in fact, takes that position, doesn't it? The board says, by the way, we don't like what the expert Dr. Levy is doing by looking at the examples in the specification to figure out what the claims mean because that means reading the claims too narrowly. But Dr. Levy really did just go back and said, well, I'm going to read the claims because I'm going to go back and say what examples are in the specification. Like it or not, broadest reasonable interpretation is what we're supposed to employ here, right? Correct. In light of the specification, and we have language in Proxicon and Phillips, both, Proxicon involving review of IPR proceedings, saying that you cannot ignore the language in the specification, but ignore it, the claim, for sure. And even if the board were going to get its understanding of the word application program from these prior art references, why did they seize only on that one passage? Why didn't they talk about the other passages in Domini? If you're going to read Domini, why not read the entire reference as  Why not understand that Domini was the only one? Well, we can't assume that the board didn't read the entire reference. The board cited to one passage that used the exact same language that is in the claim. Fair enough. What the board cited was one sentence in the entire document. They didn't cite the language that I said, preferably the spell checker program module as called by the preferred application program module, and then Domini makes clear that the preferred application program module is Microsoft Word. You're well into your rebuttal time. You can keep going, but if you'd like to reserve some time. I would just like to mention one more thing in this context. And that is, Haakamovitch uses these words as well. I don't know why the board didn't mention that, and I don't know why the board failed to mention Dr. Levy's testimony. They made no mention of it with respect to Haakamovitch, and you can't say that he's engaged in claim interpretation there. And so Haakamovitch tags the word processor as the application program, whereas the word completion module is called a module or the autocomplete utility and is never called an application program. I think the extrinsic record here, taking into account these references, means that application programs should be construed as a program that is independently executable. Thank you. I'll reserve the rest of my time. Mr. Pelmore. Thank you, Your Honor. May it please the Court. The board correctly construed the broad claim term application program and correctly rejected Arendi's attempt to artificially narrow it. In particular, the board correctly found that the broadest reasonable construction of application program does not exclude so-called subsidiary programs, nor does it encompass only programs that satisfy Arendi's checklist of features. And critically, the board correctly found that the broadest reasonable construction of application program includes programs that are expressly called application programs in the prior art. If this was just under Phillips, would you agree that the specification is specific enough to limit application program? I wouldn't agree at all, Judge O'Malley. I think we would win this case under Phillips as well. There are a couple things to point out about the specification. One, the specification never uses the phrase application program. So this case turns on the meaning of the claim term application program. That term doesn't appear in the specification. Second, none of the features that Arendi is talking about, Arendi has a checklist of what a program has to be in order to be an application program. You have to be able to open it by double-clicking, it has to run in a separate window, and it has to run asynchronously. Critically, none of those features is even mentioned in the specification. One would think that if the inventor had intended to limit the broad claim term application program through the specification, the inventor would have used that term in the specification, and if he had intended to limit the term to these common features of the embodiments, those features would have been discussed. A couple of the examples of Microsoft Word and Microsoft Outlook, those would all satisfy those criteria, right? Those arguably would satisfy the criteria, but none of those features is mentioned, and that's critical. Because, of course, under Phillips, it's impermissible. Of course, claim terms are read in the context of the specification. That's always the case. But it's impermissible to limit broad claim language to the common features of the embodiments, and that's what's happening here. And none of the features, so I think even full stop, what Arendi is trying to do would fail, but particularly in this case, where one, none of those features is even discussed, two, where the claim term is not mentioned in the specification, and three, where the specification, as the court recognized, expressly disclaims that kind of embodiment-limiting claim interpretation. We cite those passages at page 31 and 32 of our brief. Given all of that, this attempt to limit the broad claim terms fails, and I think the court- What does the concept of being independent mean, an independent executable program? I think all the board meant by that, I think it's quite simple, was that it's a separate program, whether it acts as an add-on or whether it acts as a standalone. It has some separate identity, and I think this is best- I'd love to know what you mean by separate. Well, I think I can show that graphically to you. Are they separate parts of the RAM, for example? Do you mean that they have to be coded separately? They were written at different times. What is it that you think you mean by separate? Just that they- I think if you look at Figure 1, the court was talking about Figure 1 of DOMINI, and I think this highlights it. So this is reproduced at JA-12 in the board's opinion. The board found it very important. And this is the DOMINI system. The entire system is graphically displayed here. And you see, if you look at the bottom left corner, you have an operating system, 36, and then you have a number of programs, all under the number 37. You have 37A, the word processing program, 37B, the spell checker program, 37C, the grammar checker program. Then you go over to the right, 37D, application program, number 4, 37E, application program, number 5. So application programs 1 through 3 are the word processor, the spell checker, and the grammar checker. What Arendi is trying to do here is, in a sense, draw a line between 37A and 37B, and say, well, under DOMINI, the word processing program is an application program, but for reasons not disclosed anywhere in DOMINI, everything on the right of the line, 37B and 37C, are not application programs. The board rejected that as a factual matter. I understand that that is the factual component of what DOMINI discloses, but going back to claim construction, what does the board mean by independent? Right. Well, it's critical to point out, one, that this... I don't care about DOMINI for a second. We'll put DOMINI aside. Independent, executable, that phrase doesn't appear in the patent, of course, but this is about application program. You're not objecting to that. Right, but the board read... The critical argument that was made by Arendi, both before the board and here, was that application program excludes so-called subsidiary programs, or put another way, that it encompasses only programs that satisfy this checklist of common features from the embodiment. That was the only argument that Arendi advanced before the board. It's the only argument that it advances here about why the prior art did not disclose an application program. Are you going to get to an answer to my question at some point? Yeah, Your Honor, the court didn't elaborate... The PTO didn't... The board, I'm sorry, I didn't elaborate on this phrase, independent, executable, but it becomes apparent when you read the entire opinion, what it meant, and it read it in the context of the prior art, and it's permissible to look at prior art when doing claim construction, and it looked at two things. It looked at the DOMINI graphic and said... It showed that these are all separate programs. They all exist at separate places in memory and on the hard drive, and then on the facing page, A13, it recognized, as the court has recognized, that these are all labeled application programs, and then when it was discussing Haakamovich, the court recognized that Haakamovich can run in an application-independent mode, meaning that it can run with any number of other applications, and that was enough. I don't think that the court... The board needed to elaborate on this idea of independent executable. It's not in the patent. What's in the patent is application program, and it was simply... It was satisfied that all this calls for is a separate program or a conceptually distinct... If we disagree with the board's construction of application program, would you agree that there is no anticipation under either Haakamovich or DOMINI? Well, I think it would have to go back for the board to evaluate under a proper claim construction, but I don't think there's any basis for that here because, again, the critical issue was whatever the affirmative meaning of application program was, does it exclude subsidiary programs? That was really the only... That was the nub of the issue before the board. That's the nub of the issue before this court. The board explained at length why that was incorrect because it has no support in the claim language. It has no support in the specification, which doesn't use application program, which doesn't discuss any of these features, and it has no support in the prior art, which is a permissible source of extrinsic evidence when doing claim construction, which clearly and expressly labels programs that Arendi seeks to exclude under the broadest reasonable construction. The prior art calls those application programs. Let me ask you the same question with respect to associate. If we find that the board erred with respect to that construction or that term, would that still have to go back, or do you think that there's anticipation even under Arendi's construction? Well, a couple points on that, Judge O'Malley. One, we don't think Arendi has properly advanced that argument because it hasn't shown any prejudice from the board's construction. Putting that aside, I think it would have to go back because it's not at all clear what Arendi means by this idea of a preexisting relationship, and I think there's a very strong argument that the prior art would disclose associated even in that sense. For instance, the DOMINI grammar checker, one of the examples we talk about in our brief, recites an example of using have when really you should use has, and the grammar checker alerts you to that. I would suggest there's a preexisting relationship between have and has as the two forms of the same word, so it's not clear why even under Arendi's... You're an English major. It's not clear even under Arendi's construction... At least I get this one, though. Right, why the prior art wouldn't be invalidating, but putting that aside, I think the board's construction of associated with is quite clearly correct. It's not a technical term. It just means connected or related to, and again, Arendi is trying to tease out common features from the embodiments and put a gloss on that. But the board's argument or the board's rationale was a little odd. Don't you agree that the fact that there could be more than one response doesn't really have anything to do with whether there's a preexisting relationship? Well, I think the board's fundamental submission was that this is not a technical term. It just means connected or related to, and in fact, as we point out in our brief, that's exactly the same construction that Arendi has used in district court litigation. It just said it's connected or related to, and whether it's have and has or whether it's a misspelled version of a word and a correctly spelled version of a word, those things are associated with, they're related, and they're connected. Can I ask you to go back to independent and executable for a second? Sure. Because I'm still struggling a little bit with this. Do you believe that the board meant independent executable program to be the same as independently executable program, or do you believe that the board drew a distinction and adopted a different claim construction than the patentee wanted? I think the board did adopt a different claim construction. I think Arendi would lose either way, but I think it's critical to point out what happened here, which was in the initial decision, the board said we construed it as an independent executable program and is not limited to the particular embodiments, which is an argument that Arendi made at the preliminary stage. Arendi then said, we'll assume that was a typo. We think you really meant independently executable. And the board said no. And if you look at A12, the board again says it's independent executable. But critically, the sentence right before that is patent owner has not shown that the broadest reasonable construction of application program excludes subsidiary programs. We determined that application program is construed as an independent executable program. The board obviously didn't perceive any dissonance between those two statements, and there is none. But I do. And the reason I do is tell me how a spell checker is independently executable outside of the word program. Well, that is not what the board meant by independent executable. It could not have meant that because it had just gone through page after page of rejecting that very interpretation of application program. Keep in mind, Judge Moore, that this independent executable phrase does not appear in the 854 patent. Yeah, but that's the construction they adopted. And so that's a question of law. You haven't appealed that construction. But no, the construction was in two parts. It was that it does not exclude subsidiary programs and that all it requires is that there be an independent executable program. And then it read this in light of Dominy and in light of the figure that we were talking about before showing that each of these programs occupies a different space on the hard drive, a different space in memory. They're all called application programs. There's no support in Dominy, nor is there any support in the specification for this idea of subsidiary programs being excluded or a requirement that you have to double-click on it in order for it to be an application program. I agree the board's construction includes both parts. I mean, I think that that's the most accurate reading of their opinion. I just am trying to figure out what they mean by independent. And certainly they mean independently executable. You said under either circumstance, Arundi loses. If the board said the construction was independently executable, wouldn't you agree that a spell-checking subsidiary program is not independently executable? No, I wouldn't agree, Judge Moore. I think it still runs separately. That doesn't mean that it runs by itself in the sense of double-clicking. It means it has separate identity. It performs a different function. The word processor can work without the spell-checker. But how could you execute it? Independent of the word program. Well, if you look at Dominy, you click on it to run the spell-checker. So the user does execute it. So I don't think that's... It just means that it runs. But you can only click on it within the program. That's correct. And it is expressly called an application program in the Dominy patent. So I think it's critical to point out here that this is a broadest reasonable construction case, that the term at issue is application program, that the only argument advanced by Arundi below or in this court for why the prior art did not disclose an application program was that application program excluded subsidiary programs, meaning that it only includes programs that include a checklist of features. And under the broadest reasonable construction of application program, I would suggest that that argument fails. Okay. Thank you, Mr. Kalmar. Mr. Stensky, you have a little bit of rebuttal time left. Interestingly, the board's construction of application program as failing to exclude dependent subsidiary programs first was announced in its decision. So in that respect, this case is similar to SAS Institute versus Complete Soft LLC decided by this court on June 10. In that case, a remand was earned. But in this case, we have a definition that's self-contradictory. A remand does nothing when the board got the claim construction so very, very wrong. We have the fact that with respect to application independence in Hakamovich itself, column 4, lines 24 to 28 at A851, application independence. This is Hakamovich explaining it. And the board just got it wrong. Application independence is the ability of the same word completion system, not application program. The same word completion system to work with several different application programs such as a word processing program, an email program, a spreadsheet program, and so forth. And we have Dr. Levy's testimony that in those contexts, for sure, it continues to be the word completion program a subordinate dependent subsidiary program. So nothing's changed. The board just got it wrong. Do you agree with your friend on the other side that as it relates to the term associated that to the extent that you complain about the board's construction, you waived any ability to ask us to disagree with that construction because you didn't raise any basis upon which to conclude there was any prejudice. We addressed this in the reply brief. And once claim construction's at an issue, of course there's prejudice because you can find that... No, not necessarily. A lot of times alternative claim construction still lead to a conclusion of infringement or a conclusion of anticipation or a conclusion of obviousness. I suppose that's the case. But we made that distinction because we think it made a difference. I know, but you didn't argue in your brief why it made a difference. You didn't give us anything to say that under my alternative construction there would be no anticipation. I apologize if the court could infer that. The reason we emphasize the construction associated is because we felt there has to be a pre-existing association. And again, if one looks at the context in the specification, of course in the contact management system a name is associated with an address. There is a pre-existing association. In Haakamovich and in Domini, the association, if you can call it at all, comes only because on the fly they come up with a suggested word to complete or a word that maybe is misspelled. They don't exist in the database from the beginning. And the whole purpose of the Hedloy technology, the whole purpose of the technology here, again, is to in effect automate this interaction between two independently executable programs. And of course, if the association didn't exist, we're not talking about the programs that Hedloy used for which he was trying to automate the interaction. So to me it seemed obvious, and I apologize for having failed to make that so clear. Okay, Mr. Sunstein, we're well beyond your rebuttal time, so we're going to have to call this one. I thank both counsel for their argument. The case is taken under submission.